**Calvin L. BERRY, Plaintiff,**

v.

**E.I. DUPONT DE NEMOURS AND COMPANY, Defendant.**

**Civ. A. No. 83–348–JLL.**

United States District Court,
D. Delaware.

Dec. 31, 1985.

---

Arthur Inden and Barry M. Willoughby of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Richard B. Weiss, Los Angeles, Cal., of counsel, for plaintiff.

Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Alan G. Burton of E.I. duPont de Nemours & Co., Inc., Wilmington, Del., of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

The plaintiff in this action, Calvin L. Berry ("Berry"), while a resident of Delaware, filed an action for declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e *et seq.* ("Title VII") and pursuant to 42 U.S.C. § 1981 ("Section 1981") against the defendant, E.I. duPont de Nemours and Company ("DuPont"), a Delaware corporation.[1] The plaintiff, who is black, alleges that the defendant unlawfully discriminated against him because of his race in violation of these acts by denying the plaintiff a transfer and ultimately discharging him, by failing to assist him in locating outside employment, and by failing to provide certain benefits and services normally accorded to employees prior to termination. (Docket Item ["D.I."] 1.) The plaintiff seeks fifteen million dollars in punitive and compensatory damages. (*Id.*) In an order dated October 30, 1984 (D.I. 31), the Court denied the defendant's motion for summary judgment. (D.I. 23.) The Court heard testimony from the parties and their witnesses in a two-day, nonjury trial on October 15 and 16, 1985. (D.I.'s 41–43.) This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

## I. BACKGROUND FACTS

Berry began his employment with DuPont on February 1, 1969, in El Monte, California.[2] (Berry, A–2.) Berry next moved to San Francisco where he was a commercial assistant for two years. The plaintiff received a raise but otherwise this was not a promotion. Berry next moved to Wilmington, Delaware, in a "lateral transfer," again with a raise, as Customer Service Representative. (Berry A–3.) In this position, Berry handled the orders either by mail or by phone for eleven western states. Customer Service Representatives had to ensure that the proper material was shipped in a timely fashion, in the correct quantity, to the proper location, and to ensure that customers would receive invoices. They were responsible for any adjustment on the invoices. Customer Service Representatives received on-the-job, but no formal, training from DuPont. (Berry, A–4.) Berry was in this position for approximately a year and a half.

Berry was then promoted to Product Coordinator and received an increase in pay. The position of Product Coordinator is in the same division, the Sales Order Center, as Customer Service Representative. As Product Coordinator, Berry handled methanol products and their derivatives. If there were product shortages, Product Coordinators would determine which customers would get the product, their order of preference, the shipping point of the product, and the carrier. Berry's superiors in this position were Bob Frank, Bob Matthias, and R.N. Selby. He held this position for approximately six months. (Berry, A–5.)

Berry was next promoted to Customer Service Supervisor. In this position, Berry's duties were supervising and training customer representatives, making trips to resolve problems with salesmen, and attending sales meetings. This promotion also was accompanied by an increase in pay. Berry was in this position for approximately a year and a half.[3]

---

1. The Court exercises jurisdiction under 28 U.S.C. §§ 1331 and 1343. Venue is based on 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391.

2. References are to the Trial Transcript (D.I.'s 41–43), by witness, volume of the transcript, and page.

3. Richard Selby, Marketing Services Director at this time, testified that of the four Service Supervisors in the Sales Order Center, Berry ranked at the bottom of the group in relative performance. (Selby, C–12.)

In 1978, Berry was transferred to the Physical Distribution Group ("PDG"), where the difficulties which are the subject of his complaint occurred. (Berry, A–6.) Berry was told that this was a lateral transfer. As Distribution Coordinator, he was responsible for methanol products and their derivatives and for the transportation of these products. Distribution Coordinators had to ensure that the proper construction materials and size of equipment were being used and to coordinate terminals, plants, and shipping points. (Berry, A–7.)[4] Ron Sheff served as the plaintiff's first supervisor for approximately eight months. Berry had approximately six co-workers when he first came into the division. (Berry, A–8 to A–9.)

Approximately six months after his arrival, Sheff gave the plaintiff a "good" rating in his performance review. DuPont uses five rankings in evaluating employees: outstanding, excellent, good, satisfactory, and unsatisfactory. (Berry, A–10.) During a performance review, the plaintiff would discuss areas of improvement with the supervisor. Concerning this particular review, the plaintiff stated at the trial that areas of improvement included becoming more involved with the terminals and plants and "in the day-to-day operations," because he was new with the group. There were no scheduled weekly meetings but meetings were called once a week or every two weeks when there were "areas of concern." (Berry, A–11.) At this time there were only group meetings, not one-on-one meetings, between the plaintiff and Sheff. (Berry, A–12 to A–13.)

Sheff left the division around April of 1979 and was replaced by J.P. Sipe. Sipe was a Product Coordinator already when he was transferred to this position. (Berry, A–12.) As a co-worker, the plaintiff himself testified that he had gotten along with Sipe and did not have any problems with him. (Berry, A–12 to A–13.)

At the time Sipe was transferred to the position of Distribution Service Supervisor, Berry was being considered for a transfer. Sipe reviewed with Sheff the performance of the people he would be supervising.

---

**4.** Berry received a standard description of the position of Distribution Coordinator about a month after he arrived in the Physical Distribution Group. (Berry, A–8.) The description indicates the broad demands and responsibilities of the Distribution Coordinator. In this position, Berry was responsible for coordination of rail, barge, and truck shipments of an assigned group of chemicals and pigments products and special assignments concerning this coordination. (PX 22.) Distribution Coordinators report to the Distribution Supervisor. Distribution Coordinators are also responsible for "innovation and development of programs designed to improve distribution methods aimed at reducing inventories (cost) and increasing the reliability of deliveries to customers." A prime responsibility of the Distribution Coordinator is the sizing and deployment of tankcar fleets because considerable investment and leasing costs are involved. The objective "is to keep costs as low as possible consistent with maintaining good delivery service." Thus, cost estimates for equipment and procurement are a part of this responsibility. Another responsibility is the maintenance of railcar, truck, and barge fleets in first class condition at reasonable cost to ensure the safe and efficient delivery of products to customers. Another "prime responsibility" is the scheduling and movement of DuPont's methanol tanker which supplies the East Coast through the Gulf and the movement of methanol and sulfuric acid barges on the Mississippi and Ohio Rivers.

Other special assignments in this position are carrier coordination of containerized export and import movements of products and raw materials, the development of freight rates to meet competition, implementation of railcar and truck detention programs, writing and maintaining terminal and warehouse operating manuals, and making surveys of receiving and unloading facilities at customer plants. The Distribution Coordinator also must be on call to handle transportation emergencies, which require considerable knowledge of transportation equipment and the hazardous nature of the products and steps needed to resolve problems. Expertise in government regulations concerning the transportation of chemicals is also a requirement.

The description also informs the beginning Distribution Coordinator how the complexity of duties and responsibilities of the position involves a wide range of contacts within DuPont because of complaints and other customer problems, as well as frequent contact with district office people, salesmen, plant people, and carriers. The last paragraph of the description states: "It is on the above performance that the encumbent will be rated during his appraisal by his supervisor." (PX 22.)

Sheff informed him that in Berry's last performance appraisal, Berry had received a "good" rating. (Sipe, A–80.) Berry's knowledge of the operations of the Sales Order Center in the District Sales Offices was termed very strong. (Sipe, A–80 to A–81.) However, in Sipe's discussions with Bob Young, his superior, Young had indicated concerns about Berry's ability to "handle the job," and stated that Berry had "special skills that could be used in the Export Order Center." (Sipe, A–82 to A–83.) At the export group, the plaintiff would have been a Customer Service Representative.

When Berry was informed of the transfer, he told Sipe and Young that he thought that that job would have been a demotion and that he did not want to take the job. (Berry, A–14.) Berry discussed this transfer with Young's superior, Frank Rummel, the manager of the Physical Distribution Group. Rummel sent Berry over to see the export manager, who confirmed that he would be a Customer Service Representative. The plaintiff then went to see Selby, the Marketing Services Director. The plaintiff remained in the position as Distribution Coordinator and did not hear anymore about the transfer. (Berry, A–15 to A–16.) [5]

During the late 1970s, the general management of the department of Physical Distribution became increasingly concerned about the rapidly escalating costs of the department's activities. (Selby, C–13.) These costs were having an adverse effect on the department's earnings. The management responsible for PDG was asked to inquire into measures that could bring the costs under control. Parallel Planning Corporation ("PPC") was retained as outside consultants in the second half of 1978. After investigating the group, PPC found that PDG was very effective in assuring the safe transportation of chemical products and was filling the needs of the customers very well. However, PPC found that PDG was not doing a very good job in cost control. The procedures were lax, and cost control was relegated to a low priority. (Selby, C–13 to C–15.)

In June 1980, Sipe gave Berry his first performance review as Berry's supervisor. (Sipe, C–23; DX 1.) In this review, Berry's performance was downrated to "satisfactory" from "good." Although Berry "effectively handled the day-to-day problems" and "contributed positively to the group by providing guidance to other coordinators," Sipe stated that Berry had to improve in other areas as coordinator. Specifically, Berry had to improve in development and implementation of assignment programs, because he was very weak in planning ahead, in time management, and in written communications. (DX 1.)

Sipe's next action concerning Berry was the formulation of an improvement program in July of 1980. The improvement program, which outlined steps to improve Berry's performance, reiterated Berry's inability to develop and implement assigned programs in general and his inability to effectively manage his time as principal concerns.[6] These points were discussed

---

5. The plaintiff stated at the trial that although he did not hear anything more about the job transfer, one man had been assigned his job as Distribution Coordinator but had had a heart attack. Berry was thus able to stay in his present position. (Berry, A–16 to A–17.)

6. The improvement program listed four areas that were "not acceptable": (1) the development and implementation of programs to properly size and deploy methanol and other tankcar fleets; (2) identification, development, and implementation of cost production programs; (3) continued development of terminal operations at Port Elizabeth, New Jersey; and (4) coordination of the carrier switch for tank truck ship-

ments at the Belle Plant. The report also specifically spelled out a time frame in which Berry's improvement should be gauged: "For Cal to maintain his current position within DuPont, he needs to make a concerted effort to improve his program management and time management skills over the next five months, and to close out those specific programs as per the timing noted below." The report noted that Berry's communication skills had a negative impact on his program management skills. The report then specified the programs in which Berry was expected to obtain a satisfactory performance. Finally, the report specified the measurement system to gauge these results in four specific areas. For example, Berry would have to meet time

with Berry following a performance appraisal update on July 25, 1980. Sipe noted the action plans and the dates by which the plans were to be completed for Berry to be rated satisfactory. PDG's reorientation by PPC meant that the acceptable performance six months ago would not be acceptable now. The report, which summarized the discussion with Berry, also noted that if the action plans were not completed in an acceptable manner, Berry stood a "very good chance of being rated unsatisfactory." (DX 3.) Berry was also given a written summary of the performance appraisal update, dated July 28, 1980. (DX 4.)

In a meeting with Todd Kuchler, Manager of Physical Distribution, in September of 1980, the plaintiff was asked to prepare a list of methanol distribution items and to develop a program to address these items. In a memo to Berry from Sipe, Sipe noted that he had not yet received either a list or draft of the list. The memo noted that Berry's performance concerning this list was not acceptable. (DX 6.)

In September 1980 Berry wrote to Kuchler requesting to be transferred. (PX 11; Kuchler, C-53.) That memo recounted certain criticisms Berry had received from Sipe and Young in which Berry was told his position was in jeopardy.[7] After receiving that request, Kuchler met with the manager of Personnel and Industrial Relations to discuss the available options. He then met with Berry (Kuchler, C-53 to C-54.) Kuchler told Berry that it might be possible to transfer him to a Physical Distribution job at a plant site or, alternatively, to the Sales Order Center. (Kuchler, C-54 to C-56.) Berry, however, was not interested in either opportunity. (Kuchler, C-56.) Kuchler concluded that it was unlikely, given Berry's performance, that another department would accept him for transfer. (Kuchler, C-55.) Thus, Berry remained in the Physical Distribution Group.

Sipe left his position as Berry's supervisor sometime in October of 1980. Sipe testified at the trial that had he been asked to rate Berry's performance during the period of June 1980 through the fall of 1980, he would have had to rate him unsatisfactory. (Sipe, C-25.) Sipe also testified that race was not a factor in his evaluation of Berry's performance. (Sipe, C-25 to C-26.)

In November 1980, Steven Rogers became Berry's supervisor. Rogers testified that during his tenure as Berry's supervisor, Berry's performance was unsatisfactory. (Rogers, C-26.) In general, Berry's performance was unsatisfactory because he did not exercise leadership in his job position, failed to generate appropriate cost reductions, lacked problem-solving skills, and failed to meet commitments on numerous occasions. His writing was also unacceptable. (Rogers, C-26 to C-27.)[8] In ad-

---

commitments as noted in the action plans. Late compliance was not acceptable and would be noted and reviewed with Berry monthly. Supervisory involvement would have to be minimized in implementing the assigned plans; supervision of Berry for periods greater than thirty minutes would be noted and reviewed with Berry monthly. (DX 2.)

7. In this memo, the plaintiff stated, in pertinent part:

I was told by R.E. Young and J.P. Sipe on 9/22/80 that my performance was in such disarray that my position as a Distribution Coordinator was at stake. It is virtually impossible for my performance to have deteriorated to this level.... I was told that my products were "out of control...." I was told on 9/22/80 that my performance was not acceptable because I did not produce very much in the way of savings; that I was re-

sponsible for the BAD water problem at Chambers Works (explanation attached); and that I had not completed the methyl amine fleet sizing program.

The plaintiff then stated that he was leaving the group "since Mr. Sipe has such strong feelings against me and the fact Mr. Young is in full support of Mr. Sipe." (PX-11.)

8. As examples of Berry's deficiencies, Rogers gave the following. A district manager had requested some tankcar freight rate information from the West Coast sales office. Berry was assigned to provide the competitive information on freight rates on DuPont's near ship points. Berry had failed to follow through to the deadline such that a Mr. Van Kirk, the district manager on the West Coast, called Young, Rogers' boss, to inquire where the information was. Subsequently, Young and Rogers had to do the

dition, in 1980 Berry generated only about $380,000 in savings while the average for the total group of seven Distribution Coordinators was over one million dollars. This was the lowest in the group and significantly below the average.[9] (Rogers, C–29.) Rogers also stated that Berry's performance was the lowest in his group of Distribution Coordinators. (Rogers, C–33.)

Rogers testified that during his tenure as Berry's supervisor, Berry's performance did not improve. (Rogers, C–36.) In December of 1980, Rogers wrote a memo to Berry summarizing two reviews he had had with Berry in November and December of 1980. In the summary, Berry's current performance was rated "unsatisfactory." Berry had to improve in order to maintain his current position. Further, although in his November review, Berry had been required to develop two action plans, he had not included any new plans in his weekly summaries since November. The report stated that Berry's failure to follow through with the assigned work on the action plan was unacceptable. The report also stated that Berry had made a commitment to issue final reports in November on two programs and that to date he had not fulfilled these commitments. The report stated that in this respect also Berry's failure to meet commitments was unacceptable. (DX 9.) [10]

Berry's next performance review with Rogers was in March of 1981. (Rogers,

C–36.) Again, Berry's performance was rated unsatisfactory. The report noted the below-average $380,000 that Berry had achieved in cost savings ideas in 1980. The report noted that Berry had achieved several things including major tankcar fleet sizings, adding the Houston plant as a methanol shipping point to meet the seasonal business needs, and assisting with conversion of common carriers at Belle. The report, however, noted the continuing deficiency of Berry in the areas that had already been mentioned, such as developing cost savings, initiating leadership of distribution activities, and improving quality of action plans. (DX 10.)

In July 1981, Rogers had a meeting with Berry, which was summarized in a memo to Berry from Rogers dated July 2, 1981. (Rogers, C–36.) In the discussion, Berry and Rogers agreed on specific commitments which Berry would meet. These commitments were additional to the routine daily follow-up expected from coordinators. (DX 12.) In November 1981, Rogers wrote a memo to Berry, again summarizing a performance discussion on November 12, 1981. The summary lists the general problems with specific examples in which Berry's performance was rated unacceptable. Major areas of difficulty included meeting time commitments, problem solving, and writing. Concerning writing, the report states that Berry's writing required the

job in about two or three hours because Van Kirk had a meeting with a customer scheduled and needed the information immediately. (Rogers, C–27.) In another instance, Berry had failed to analyze the pricing structure to compete with the Canadians on the West Coast. Rogers had provided Berry with specific guidelines on some resources he could use in the analysis. Berry responded that he did not think it was important when Rogers asked him why he had failed to provide the analysis. Again, Young and Rogers had to do the work in place of Berry. (Rogers, C–28.)

**9.** For example, the methanol tankcar fleet, which was Berry's responsibility, was an "untapped potential." The tankcar fleet numbered about 400 railcars. The PDG controlled those cars because they were shipped from the terminals they managed and were not located at a

plant. Berry did not analyze the fleet properly to determine what was not needed to run it. (Rogers, C–29.) On another occasion, Berry did not use the correct methodology in calculating butane diole because he had omitted a factor which had been in existence for a long time in calculating the number of cars required for this chemical. (Rogers, C–30 to C–31.) The calculations involve the leasing or owning of unnecessary cars. (Rogers, C–32.)

**10.** The report also stated that Berry's fleet sizing reports on methanol and butane diole were poor in quality. The presentation of the data in the form of handwritten tables was not justified, and Berry's failure to include any provision for plant hold time in sizing the butane diole fleet was a major error. Berry was also not meeting his obligations to create cost savings opportunities for methanol products. (DX 9.)

most rewriting and editing in the group. Rogers stated in the summary that he did not see any improvement or indication that Berry was learning from the editing. (DX 13.) [11]

Since Berry's performance failed to improve, Rogers had a discussion with Young, his superior, in which he told Young that he had not seen any improvement in Berry during the year and that in his opinion it was in the best interests of DuPont to locate another position for Berry. Rogers stated at the trial that race was not a factor in his evaluations of Berry nor was race a factor in any actions he took with respect to him. (Rogers, C–36 to C–37.)

On January 4, 1981, Carl Antonson, PDG Manager at the time, informed Berry that he was going to be transferred to the Sales Order Center. (Berry, A–46.) Young had requested Antonson to find a suitable replacement and a suitable new job for Berry which they believed that Berry could perform adequately. (Young, C–44.) Toward the end of the summer of 1981, Antonson had developed serious doubts that Berry was capable of performing at a satisfactory level as a Distribution Coordinator. By fall he had decided that it was unlikely that Berry's performance would ever be satisfactory in this position. Antonson spoke with Bob Buch in the Sales Order Center, which is now the Customer Service Center, about returning Berry to a job that was similar to the one he had held previously. They ultimately discovered a vacancy in the Customer Service Center. They believed that based on Berry's previous experience he would do a good job in that position. (Antonson, C–75.)

The organization of the Sales Order Center differed at the time that Berry was originally there from the time he was again offered a job there. In 1978 the organization consisted chiefly of Customer Representatives who were "non-exempt" salary employees. (Selby, C–17.) "Exempt" employees are exempt from the Fair Labor Standards Act of 1937. (Horn, C–60.) These Customer Representatives reported to Service Supervisors, which Berry was at the time of his departure from the Sales Order Center. The Service Supervisors were at Exempt Level 3 in the DuPont salary system. The Service Supervisors reported to Customer Order Supervisors at Level 4 who in turn reported to a manager, who was a couple levels higher. In 1981, when Berry was offered a position as Customer Representative, Customer Representatives had been elevated from non-exempt salary positions to exempt positions at Level 2A. The positions of Service Supervisor and Customer Order Supervisor, which had been at Levels 3 and 4, respectively, had been combined into the single position of Customer Service Supervisor, thus eliminating one layer of supervision in the organization and moving the position of Customer Representative from a non-exempt to an exempt salary position. Thus, the level of Customer Service Supervisor in late 1981 was Level 4. Berry's level in late 1981 in the PDG was Level 3. (Selby, C–17 to C–18.) Thus, the proposed transfer for Berry from Physical Distribution Coordinator to Customer Representative in 1981 would have been only one-half level down, from Exempt Level 3 to Exempt Level 2A. The transfer would not have involved any cut in salary or in benefits either then or in the future. The effect of the proposed transfer on Berry's future earnings would have been entirely dependent upon his performance in the new position. (Selby, C–19.) [12]

---

**11.** This report ended with the overall status as follows: "Your performance rating this year is 'Unsatisfactory.' It is our opinion you have not made any substantial progress and improvement this year. As we have discussed, we will continue to provide training and guidance to help you improve your performance." (DX 13.)

**12.** DuPont had an established policy with regard to "non-exempt" employees who became "exempt" such as Berry who performed poorly in their "exempt" position. The individual had the option, as a "last fallback," to return to the non-exempt job. (Horn, C–63.) Berry, who for some time had been rated "unsatisfactory" as an exempt employee, ranked at the bottom one-half

Antonson spoke with Berry in January 1982 about this position and Berry refused to accept it. (Antonson, C–75 to C–76.) After at least two other discussions and after Berry had talked to Buch about the job, and had decided not to take it, Antonson urged Berry to go home and think about it for a couple of days. (Antonson, C–76.) Berry returned and said that he still had decided not to take the job, and Antonson told him again that there was no job for him in PDG. (Antonson, C–76 to C–77.) Berry then cleaned out his desk and left. (Antonson, C–77.) It was Antonson's decision that Berry would not have a job if he did not accept the position in the Sales Order Center. (*Id.*)

DuPont has a service called the Out-Placement Service. Berry, who had been offered another job at DuPont, was not offered this service because he did not qualify for it. The Out-Placement Service is used only for individuals for whom there is not a job available at DuPont. The job offered to Berry was a "legitimate opening that needed to be filled" and was not a "make-work job." (Antonson, C–77.) The company believed that Berry could perform that job because he had handled similar positions previously. Antonson testified that Berry's race was not a factor in his actions toward him. (Antonson, C–77 to C–78.)

Berry testified that after he was released from the company he began seeking other employment "right away." (Berry, A–55.) He contacted the local Wilmington office of the EEOC on January 6, 1982, the same day that he left DuPont. (*Id.*) However, in order to file charges properly, Berry had to go to the Philadelphia office of the EEOC. Berry's filing of the discrimination charge is dated September 22, 1982. (PX 6.) Berry received a Notice of Right To Sue from the EEOC dated February 22, 1983. The Notice stated that there was no reasonable cause to believe that the allegations made in Berry's charge were true. (PX 7.) The form went on to inform Berry that if he decided to sue DuPont he must

to one percent of such employees in his per-

file a complaint within ninety days from the receipt of his notice of the right to sue; otherwise his right to sue was lost. (*Id.*) The envelope containing this form is dated March 28, 1983, with a handwritten note, "received March 29th." (PX 8.) Berry testified that he received the notice on March 29. (Berry, A–58.)

After his dismissal from DuPont, Berry began searching for work in Wilmington and was turned down by every company. (Berry, A–59.) Only in July of 1983 did Berry begin work, when he worked for a couple of months at a collection agency. Finally, he obtained permanent employment in Los Angeles in April of 1984. (*Id.*)

## II. ANALYSIS

The plaintiff has offered little in this case in the way of substantive evidence of discrimination. In addition, the defendant has raised legitimate questions concerning the statutes of limitations for the two claims under Title VII and Section 1981. The Court will address the procedural issue of the statutes of limitation first since its resolution in favor of the defendant may make unnecessary consideration of the plaintiff's claims on their merits.

### A. Statutes of Limitation Under Title VII and Section 1981

#### 1. Filing Period for Title VII

The defendant argues that the plaintiff did not timely file a charge of discrimination under Title VII with the EEOC and that his claim under that law is therefore barred. (D.I. 45 at 21.)

Generally, a party may prosecute an action under Title VII in district court only if he has first filed a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e). However, in a so-called "deferral" state, which has a local or state agency that has been instituted to hear charges of employment discrimination, the period for filing charges with the EEOC is somewhat different. 42 U.S.C.

formance. (Horn, C–62.)

§ 2000e–5(c).[13] A complainant in such a deferral state must file a charge with the EEOC within 240 days of the last alleged act of employment discrimination. The ninety-day deferral period, during which filing with the federal agency must be delayed, is automatically added to the original period of 180 days—whether or not the claimant files a charge of discrimination with the local or state agency.

Delaware is a "deferral" state,[14] and it is in that state where the plaintiff alleges that acts of discrimination occurred. Therefore, at the maximum, the plaintiff had 240 days within which to file charges with the EEOC. The plaintiff would have conceivably had more than 240 days for the filing if he had filed charges with Delaware's Department of Labor, but he did not do so.[15]

■ The plaintiff in this case filed a charge of discrimination with the EEOC on September 22, 1982. (D.I. 39, ¶ 3(1); PX 6.) The last act of the defendant's alleged violation occurred on January 6, 1982, when Berry's status as an employee of DuPont was "discontinued." Thus, the plaintiff did not timely file a charge of discrimination with the EEOC because he filed with the EEOC more than 240 days after the last alleged act of discrimination occurred—259 days.

■ In his complaint, the plaintiff alleges that the unlawful employment prac-

---

**13.** 42 U.S.C. §§ 2000e–5(c) and 2000e–5(e) read as follows:

(c) In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purpose of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

(e) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

**14.** See 19 Del.C. § 710 et seq.

**15.** Had the plaintiff initiated local or state proceedings, he conceivably would have had 300 days to file a charge of discrimination with the EEOC. He would have had less than the maximum 300 days, however, if the local or state proceedings had ended and he had received notice of their termination. In that case, he would have had until the expiration of thirty days after this notice, unless the 300-day period ended first. 42 U.S.C. § 2000e–5(e); Mohasco Corp. v. Silver, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491 n. 16, 65 L.Ed.2d 532; Ferguson v. E.I. duPont de Nemours and Co., Inc., 560 F.Supp. 1172, 1190 (D.Del.1983). In his post-trial brief, the plaintiff erroneously misreads Mohasco to interpret the provisions on timely filing under Title VII as extending the period for filing in deferral states from 180 days to 300 days, without qualification. (D.I. 44 at 2.) The plaintiff cites PX 8, the right to sue letter which he received on March 29, 1983, and the fact that the complaint was filed "within the requisite 90 day time period after notification by EEOC of plaintiff's right to sue." (Id.) Although the plaintiff is correct in asserting that he met the deadline for filing a complaint in federal district court according to the terms of EEOC's right to sue letter (PX 7), the plaintiff has not met the first jurisdictional hurdle of filing a charge with an administrative agency within the requisite 240 days.

tices occurred after the termination of the plaintiff's employment with DuPont by DuPont's failure to assist the plaintiff in locating outside employment through the defendant's "Out-Placement Service." (D.I. 1, ¶ 10.) The claim may be timely under the "continuing-violation" doctrine, although the plaintiff has not argued or briefed this issue. Under the continuing-violation doctrine, a plaintiff's action is timely with respect to any act of the defendant if this act is part of a continuing course of prohibited conduct. In such a case, the plaintiff will be allowed to litigate statutory violations within the limitations period and all preceding violations that are part of that course of conduct. *Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*, 667 F.2d 1074, 1080–82 & nn. 16 & 17 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Van Heest v. McNeilab, Inc.*, 624 F.Supp. 891, 896 (D.Del.1985).

The plaintiff offers no substantive evidence to support his conclusory statement that the defendant failed to assist him in locating outside employment through DuPont's Out-Placement Service because of his race. (D.I. 44 at 1–2.) The undisputed evidence shows that plaintiff was not qualified for the services provided by the Out-Placement program. Howard F. Horn, Jr., a consultant in the Personnel Relations Section in DuPont's Employee Relations Department,[16] was responsible for DuPont's Out-Placement program. Horn testified at trial that only employees whose performance in their current position was unsatisfactory and to whom DuPont could not offer a suitable job would qualify for the service. (Horn, C–58 to C–59.) A qualifying employee is removed from his job for sixty to ninety days and paid full salary and full benefits. DuPont would pay the necessary costs in finding a new job, such as preparation of a resume, secretarial assistance, and telephone calls. (*Id.* at C–59.) Berry was not provided these services because DuPont *did* have a suitable alterna-

tive job available for him. (Horn, C–60 to C–61.) There was no other job available for Berry at DuPont apart from the position as Customer Representative in the Sales Order Center. (Horn, C–63.) Horn also testified that to his knowledge no employee in Berry's circumstances had received Out-Placement services. (Horn, C–61.) The plaintiff has offered no evidence to contradict Horn's sworn testimony.

There is therefore no evidence of any unlawful employment practices in DuPont's refusal to provide the plaintiff with the services of the Out-Placement program. DuPont decided not to provide the program to the plaintiff as the result of standard procedure and was not made because of racially discriminatory reasons. Without at this juncture reaching the merits of the plaintiff's other claims of employment discrimination, the last alleged act of discrimination occurred on January 6, 1982. Thus, even under the continuing-violation doctrine, the plaintiff did not file timely his charges of discrimination under Title VII. His claims under that act are therefore barred.

### 2. Statute of Limitations For Actions Under Section 1981

The defendant argues that Delaware's two-year statute of limitations for personal injuries is the appropriate limitations period for actions filed under Section 1981 and therefore the plaintiff's claims of alleged acts of discrimination prior to June 7, 1981, two years before the complaint was filed, are barred. (D.I. 1; D.I. 45 at 21–22.) If the defendant's argument stands, then the plaintiff can only pursue its action under Section 1981 for the period June 7, 1981 to January 6, 1982.

The defendant correctly cites recent case authority of the Third Circuit and the Supreme Court. In *Wilson v. Garcia*, —— U.S. ——, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985), the Supreme Court held that a

---

**16.** Horn received his bachelor's and master's degrees from the Pennsylvania State University. He received a Ph.D. from the Wharton School of the University of Pennsylvania. He retired from DuPont on April 30, 1985. (Horn, C–57 to C–58.)

state's statute of limitation for personal injuries arising from tortious acts applies to an action of a Section 1983 plaintiff in a district court which is located in that state. The present case involves Section 1981, not Section 1983. However, the Third Circuit, construing *Wilson v. Garcia,* has held that the same reasons for selecting state statutory limitations periods for personal injuries for Section 1983 actions—the federal interests in uniformity, certainty, and the minimization of unnecessary litigation as well as the nature of a federal civil rights remedy—hold also for actions under Section 1981. *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 119–20 (3d Cir. 1985).

 ▉▉▉ Nevertheless, the Court finds that under the continuing-violation doctrine, the plaintiff's claims against the defendant for actions prior to June 7, 1981 are not barred. The plaintiff will be allowed to litigate and receive a remedy if successful on the merits for all claims that are part of the continuing violation because he has filed his charges within the permissible period. The continuing-violations doctrine is applicable to Section 1981 actions as well as to actions pursued under Title VII. The Supreme Court has recognized the applicability of the doctrine in the context of both actions. *See Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980) (in order to fall within limitations periods of the civil rights laws plaintiff should identify alleged discriminatory acts that continued until or at the time of actual termination). Several circuits have applied the federal continuing-violation rule to Section 1981 claims. *Chung v. Pomona Valley Community Hospital,* 667 F.2d 788, 791 (9th Cir.1982); *Allen v. Amalgamated & Transit Union Local 788,* 554 F.2d 876, 880–81 (8th Cir.), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977); *Macklin v. Spector Freight Systems, Inc.,* 478 F.2d 979, 994 (D.C.Cir.1973). This Court has recognized that the continuing-violation doctrine ap-

plies to both Title VII and Section 1981. *Guilday v. Department of Justice,* 451 F.Supp. 717, 723 (D.Del.1978).

 ▉▉▉ Although the plaintiff has not presented this argument, the Court finds that the acts of discrimination alleged in the complaint are part of a continuing series of acts of the same nature and that all such acts since September 1, 1980—the beginning of the acts alleged in the complaint (D.I. 1, ¶¶ 8–9)—should be examined on the merits. The last act of the alleged discrimination on January 6, 1982 falls well within Delaware's two-year statute of limitations for personal injuries, 10 *Del.C.* § 8119, which the Court must apply in Section 1981 actions. *Goodman,* at 118–20 (construing *Wilson v. Garcia's* holding on Section 1983 actions to apply to Section 1981 actions).

## B.  Plaintiff's Allegations of Discrimination Under Section 1981

 ▉▉▉ In order to establish employment discrimination under Section 1981, the plaintiff must show that the employer bore a racially discriminatory animus against the employee and that this animus manifested itself in some challenged action, whether dismissal, failure to promote, or failure to hire. *Lewis v. University of Pittsburgh,* 725 F.2d 910, 914 (3d Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the proper allocation of proof in a private action challenging employment discrimination. *Id.* at 800, 93 S.Ct. at 1823.[17] The complainant must carry the initial burden of establishing a *prima facie* case of racial discrimination. If the complainant carries this burden, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* at 802, 93 S.Ct. at 1824. The third step under the *McDonnell* analysis is to determine whether by a preponderance of the evidence the legitimate reasons offered by the defend-

---

**17.** Although *McDonnell* concerned a cause of action under Title VII, actions under § 1981 require the same elements of proof as actions under Title VII. *Lewis,* 725 F.2d at 915 n. 5.

ant were not its true reasons, but a pretext for discrimination. *McDonnell,* 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In the second step of this analysis, where the burden shifts to the defendant to rebut the presumption of discrimination, the defendant need not persuade the court that it was actually motivated by the reasons it offers. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094. If the defendant carries its burden of production at this second stage, the presumption raised by the plaintiff's *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity. The factual issue is then framed with sufficient clarity to afford the plaintiff a full and fair opportunity to demonstrate pretext. The plaintiff must show that the proffered reason by the employer was not the true reason for the employment decision. The burden now merges with the ultimate burden of persuasion that the employee was the victim of intentional discrimination. *Id.* at 255–56, 101 S.Ct. at 1094–95. In essence, the plaintiff's burden at this level is to show that "but for" the discrimination, the employment decisions attacked by the plaintiff would not have occurred. The plaintiff must show that race was a "but for" cause. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976); *Lewis,* 725 F.2d at 915.

The plaintiff must first present evidence to show a *prima facie* case of discrimination. The Court has difficulty in finding such evidence either from the testimony given by the plaintiff or by the DuPont witnesses at the trial. The plaintiff has offered several conclusory statements that he was discriminated against. The plain-

tiff asserts that he was "treated differently by his supervisor" Sipe and by his co-workers in the office because Sipe singled him out. (D.I. 44 at 3.) Plaintiff further testified that he was singled out by his supervisor and treated differently by others because of his race. (Berry, A–31 to A–32; D.I. 44 at 3.) The plaintiff also points out that he was the only black man in his office and for a period of time the only black man in the entire department of PDG. (D.I. 44 at 3.) Prior to plaintiff's difficulties with Sipe, he received "good" reviews. (*Id.* at 3–4.) At the trial, the plaintiff also stated that he had several times requested to be transferred out of his department because Sipe "was for some unknown reason trying to discredit" him. (Berry, A–36.) "Regardless of what I did, I did everything they asked me to do, I filled out all the forms, I attended all the meetings, I took care of all my responsibilities.... All of the complaints came from Mr. Sipe.... I felt that it was him—for some reason he was trying to discredit me." (Berry, A–35 to A–36.) The only reason Berry could think of for this treatment was his race. (Berry, A–67.)

A plaintiff may establish a *prima facie* case of discrimination by showing that other similarly-situated employees of a different race were treated differently from the plaintiff. Here, the plaintiff has shown no evidence that he was treated differently from other similarly situated white employees. He offers only his conclusory statement concerning racial prejudice. The plaintiff's conclusory assertion that he was treated differently by itself is insufficient to raise an inference of discrimination. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186–87 (11th Cir.1984); *Brownlow v. General Services Employees,* 35 FEP Cases 568, 571 (N.D.Ill.1984). The plaintiff also has shown no direct evidence of racial bias by the DuPont employees whose decisions affected him in his employment. Of the three employees who had the most direct contact with the plaintiff, Sipe, Rogers, and Antonson, the plaintiff points only to Rog-

ers, who he claimed to be racially biased only because he came from Boston, which "is known to be racially biased." (D.I. 20 at 128.) At trial, all the officials and employees from DuPont under oath stated that racial discrimination played no role at all in their dealings with Berry. In addition, in its decision concerning the plaintiff's merits for an actionable case, the EEOC concluded that there was no reasonable cause to believe that DuPont had discriminated against the plaintiff. (DX 17.)

■ The Court finds that the plaintiff has failed to make out a *prima facie* case of discrimination. The plaintiff has not raised an inference of discrimination from the acts which he points to on the record which, if otherwise unexplained, must be more likely than not based on consideration of impermissible factors. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ Even assuming, *arguendo*, that the plaintiff has presented such a *prima facie* case of discrimination, the defendant has effectively rebutted this *prima facie* case with explicit, legitimate reasons for the decision, first to attempt to transfer the plaintiff, and finally, to terminate his employment. The defendant has demonstrated that the underlying reason for Berry's difficulties with his position as Distribution Coordinator lay in his own performance in this position. The evidence is well documented that Berry did not perform at an acceptable level, and that for business reasons the defendant was compelled to transfer him to another type of job. The apparent difficulty began when DuPont instituted the cost reduction program in the late 1970s. This new policy changed the standards that DuPont used in evaluating the plaintiff's performance. The level that plaintiff was currently working became unacceptable. The evidence also shows that far from discriminating against the plaintiff, DuPont diligently attempted to place

him in a position which would be of benefit to both the company and to the plaintiff.

Berry's immediate supervisors, Sipe and Rogers, testified in a very detailed fashion about the specific performance problems of the plaintiff. Young, their supervisor, as well as Young's own superiors, Selby, Kuchler, and Antonson, fully corroborated the testimony of Sipe and Rogers. In addition, Berry's supervisors met frequently with him to help him to improve his work, especially his problem-solving and writing difficulties. (DX 2, 14.)

In 1978, the plaintiff was transferred to PDG, the position in which the alleged discrimination occurred. Berry received a standard description of this position about a month after he arrived. (Berry, A–8.) Thus, the plaintiff was well aware of the requirements of the Distribution Coordinator and the established procedures used for evaluating such a position. For example, Distribution Coordinators were responsible for innovation and development of programs to reduce inventory costs. A basic goal was to "keep costs as low as possible consistent with maintaining good delivery service." (PX 22.) There was testimony concerning how DuPont retained PPC to find means of reducing costs in PDG. (Selby, C–13 to C–15.) PPC found that the group was not doing a very good job on cost control. (*Id.*) Thus, DuPont legitimately focused on the plaintiff's demonstrated inability to keep costs down in his planning.

The plaintiff himself testified that at the time that Sipe became the Distribution Service Supervisor in April 1979, as a co-worker, the plaintiff had gotten along with Sipe and did not have problems with him at all. (Berry, A–12 to A–13.) It was apparently only after Sipe's discussions with Berry's former supervisor, his experience with Berry on the job, and the institution of the new policy of cost-reduction that Sipe began to rate Berry's performance as less than satisfactory.

In Sipe's first performance review of Berry in June 1980, Berry's performance was downrated to satisfactory from good. (Sipe, C–23; DX 1.) Berry was found to be

very weak in planning ahead, in time management, and in written communications. (DX 1.) Sipe, in his improvement program for Berry, in July of 1980, outlined specific steps for Berry to improve his performance in these areas. (DX 2.) These points were discussed with Berry following a performance appraisal on July 25, 1980. (DX 3.) Berry was given action plans and dates by which to complete these plans in order to remain rated satisfactory. Sipe informed him that after the reorientation by PPC, acceptable performance six months before would not be currently acceptable. Sipe also told Berry that if he did not perform in an acceptable manner in the specified areas he stood a good chance of being rated unsatisfactory. (DX 3.) Subsequently, Berry's performance was not acceptable with regard to these specified items.

Rogers, who replaced Sipe as Berry's supervisor in November 1980, stated at the trial that during his tenure as Berry's supervisor, Berry's performance was unsatisfactory. (Rogers, C–26.) This rating actually placed Berry in the bottom one percentile of exempt DuPont employees. (Horn, C–62.) Rogers specified several areas in which the plaintiff's performance was unsatisfactory. For the most part, these areas were identical to the problems identified by Sipe, but included additional areas of concern, such as failing to exercise leadership in his job position and reducing costs. For example, in 1980, Berry generated only about $380,000 in savings while the average for his group was one million dollars. (Rogers, C–29.) Like Sipe, Rogers met with Berry on numerous occasions to discuss ways to improve his performance. Action plans were developed to provide Berry with deadlines and specific goals to meet. Berry either failed to attempt to meet these commitments or his attempt to do so was unacceptable. One of Rogers' major concerns was the plaintiff's written communications, which he found required the most rewriting and editing of the entire group. Rogers did not see any improvement or indication that Berry was learning from the editing. (DX 13.)

DuPont made every effort to maintain Berry as a DuPont employee. Because of the plaintiff's failure to improve his performance, Rogers discussed with Young his opinion that it was in the best interests of DuPont to locate another position for Berry. For his part, Antonson, Young's superior, had decided by the fall of 1981 that Berry would never improve in his position as Distribution Coordinator. Antonson, and Buch in the Sales Order Center, discovered a vacancy in the Customer Service Center. Berry refused to accept a position there when he was offered it, despite repeated attempts to persuade him that this was the only available option for both parties.

The defendant has amply demonstrated that it had legitimate, nondiscriminatory reasons for its decision to remove the plaintiff from his position as Distribution Coordinator. In addition, it was the plaintiff's decision which ultimately resulted in his termination from DuPont. Since the plaintiff has offered no rebuttal evidence whatsoever to counter the defendant's evidence of legitimate nondiscriminatory reasons for their approach to the plaintiff, the Court finds that even assuming that the burden of production shifted to the defendant, the defendant has successively rebutted the plaintiff's *prima facie* case. Because the Court finds that the evidence does not show that the defendant engaged in discriminatory practices against the plaintiff, the Court need not address the issue of damages raised by the defendant in its brief. (D.I. 45 at 23.)

A judgment in favor of the defendant DuPont will be entered in accordance with the findings of fact and conclusions of law.